IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LISA CHRISTMANN,           :     CIVIL ACTION
                             :     NO. 19-1707
        Plaintiff,     :
                             :
   v.                  :
                             :
CYNTHIA LINK, et al.,    :
                             :
        Defendants.    :

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                   April 6, 2021

## I.   INTRODUCTION

Plaintiff Lisa Christmann ("Christmann") brings this action in her capacity as administrator of the estate of her late husband, Charles Christmann ("Charles"). Her claims arise from Charles's death while incarcerated at the Pennsylvania State Correctional Institution at Graterford. She brings claims pursuant to 42 U.S.C. § 1983, arguing the following defendants violated Charles's Eighth Amendment rights: Superintendent Cynthia Link; Officer Brooke Davison;[1] Lieutenant Michael McClain; Barbara Buzdygon, RN; and Kris Martin, LPN. She also brings a wrongful death claim against all defendants, as well as

---

[1]   Brooke Davison's last name is now Roberts. For the sake of clarity, the Court refers to her as "Davison," the name Christmann used in the operative complaint.

claims for negligence and medical malpractice against Buzdygon and Martin.

The defendants' motions for summary judgment are presently before the Court. For the reasons set forth below, the Court will grant summary judgment in favor of defendants Link, McClain, Buzdygon, and Martin and will deny summary judgment as to defendant Davison.

### A.   **Factual Background**[2]

While incarcerated at Graterford, Charles was assigned to E-Block, a long, straight housing unit consisting of two tiers with 400 cells spread equally on both sides. During the events in question, E-Block was staffed by two corrections officers: defendant Brooke Davison and Jesse Smith, who is now deceased.

Around midnight on February 3, 2018, Charles's cellmate, Lance Shaw, awoke to find Charles convulsing and foaming at the mouth. Shaw turned on the cell's lights and attempted to alert Davison and Smith, including by crying for help. Approximately thirty minutes later, Davison and Smith approached the cell and saw Charles sitting on the floor with his head leaning against a cabinet. They asked if he was okay. When Charles did not

---

[2]   At the summary judgment stage, the Court must view the facts "in the light most favorable to" the nonmoving party and "draw all reasonable inferences in favor" of that party. Young v. Martin, 801 F.3d 172, 174 (3d Cir. 2015).

respond, Davison used her handheld radio to contact Main Control. She communicated that Charles was unresponsive.

Davison was instructed by a superior not to open the cell door until additional staff had arrived, as unwritten security practices required at least one more officer than the number of inmates to be present before the cell could be opened. While waiting outside the cell, Davison directed Shaw to administer CPR to Charles, but Shaw was unfamiliar with the technique.

Lieutenant Michael McClain, also a defendant in this action, was Davison's immediate supervisor that evening. After hearing Davison's radio call, he gathered staff and proceeded to Charles's cell. After additional staff arrived, Davison opened the door to Charles's cell and entered. She determined Charles had stopped breathing and had no pulse, and she began administering CPR.

In response to a call from Main Control, medical staff (defendants Barbara Buzdygon, RN, and Kris Martin, LPN) proceeded to Charles's cell and began providing care. Martin testified that Charles was not breathing and was without a pulse by the time she and Buzdygon arrived. Charles was placed on a stretcher and transported to the Graterford dispensary, where he arrived around 12:50 a.m. Around 12:53 a.m., 911 was called. An ambulance arrived around 1:05 a.m., and an EMT pronounced Charles dead at 1:16 a.m.

In the instant action, Christmann argues that Charles's death "was proximately caused by Graterford's deficient policies and procedures, and Defendants' deliberate indifference to [Charles's] objectively serious emergency medical condition." Pl.'s Resp. Opp'n Defs.' Mot. Summ. J. 2, ECF No. 80.

**B.   <u>Procedural Background</u>**

Christmann's Second Amended Complaint contains the following Counts against the following defendants:[3]

Count I: Violations of 42 U.S.C. § 1983 (Davison, McClain, Martin, and Budzygon)

Count II: Violations of 42 U.S.C. § 1983 (failure to train and supervise theory) (Link, Davison, McClain, Martin, and Budzygon)

Count III: Negligence (Martin and Budzygon)

Count IV: Medical Malpractice (Martin and Budzygon)

Count V: Wrongful Death (Link, Davison, McClain, Martin, and Budzygon)

<u>See</u> Second Am. Compl. ¶¶ 70-99, ECF No. 31.

In April 2020, the Court granted Superintendent Link's motion to dismiss, which argued Christmann's factual allegations were insufficient to hold her personally liable under § 1983. Christmann then moved for reconsideration. The Court granted the motion for reconsideration in part and modified its order granting the motion to dismiss "to provide that the order is

---

[3]     Christmann also brought claims against defendants who were subsequently dismissed, <u>see</u> Jan. 31, 2020, Stipulation, ECF No. 45, as well as against Jane and John Doe defendants.

CONVERTED to leave for Defendant Link to file . . . a motion for partial summary judgment as it relates to Defendant Link and the issue of supervisory liability." June 15, 2020, Order, ECF No. 60. The Court also ordered that Link "shall not be subject to any discovery requests" until her partial motion for summary judgment was resolved.[4] Id.

Link now moves for summary judgment on the issue of supervisory liability. The remaining defendants also move for summary judgment.

## II.  LEGAL STANDARD

Summary judgment is "appropriate only when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Physicians Healthsource, Inc. v. Cephalon, Inc., 954 F.3d 615, 618 (3d Cir. 2020) (quoting Fed. R. Civ. P. 56(a)). A fact is material "if it 'might affect the outcome of the suit under the governing law.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A factual dispute is genuine "if the 'evidence is such

---

[4]     However, the Court ordered Link to attach to her motion for partial summary judgment several incident reports documenting inmate deaths Christmann identified as "cardiac related." See June 15, 2020, Order, ECF No. 60; Second Am. Comp. ¶¶ 60, 62, ECF No. 31 (alleging Link knew of "approximately seventeen (17) inmates at SCI-Graterford [who] passed away from sudden cardiac death, cardiac arrest, heart attack, other heart failure, and unexplained bleeding and/or hemorrhages" in the three years prior to Charles's death but "failed to take proper action to prevent further inmate deaths"). In accordance with the Court's order, Link has produced these reports. See infra Section III.A.

that a reasonable jury could return a verdict for the nonmoving party.'" Id. (quoting Anderson, 477 U.S. at 248).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. If the movant meets this obligation, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250. At the summary judgment stage, the Court must view the facts "in the light most favorable to" the nonmoving party and "draw all reasonable inferences in favor" of that party. Young v. Martin, 801 F.3d 172, 174 (3d Cir. 2015).

## III. DISCUSSION

### A.   Link's Motion for Partial Summary Judgment

In her motion for partial summary judgment, Link argues there is no viable basis to hold her personally liable for the alleged violations of Charles's Eighth Amendment rights. See infra Section IV.B.1.a.

Section 1983 provides a cause of action against "every person who," under color of state law, "subjects, or causes to be subjected," another person to a deprivation of a federally protected right. 42 U.S.C. § 1983. It is "well-recognized that '[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior.'" Barkes v. First Corr. Med., Inc., 766 F.3d 307, 316 (3d Cir. 2014) (alteration in original) (citing

6

Bistrian v. Levi, 696 F.3d 352, 366 (3d Cir. 2012)), judgment
rev'd on other grounds sub nom. Taylor v. Barkes, 575 U.S. 822
(2015). Rather, because "state actors are liable only for their
own unconstitutional conduct," a "defendant in a civil rights
action must have personal involvement in the alleged wrongs."
Id.

Recognizing § 1983's personal-involvement requirement, the
Third Circuit has "identified two general ways in which a
supervisor-defendant may be liable for unconstitutional acts
undertaken by subordinates." Id. "First, liability may attach if
a supervisor, 'with deliberate indifference to the consequences,
established and maintained a policy, practice or custom which
directly caused [the] constitutional harm.'" Id. (alteration in
original) (quoting A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile
Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004)). Alternatively, "a
supervisor may be personally liable under § 1983 if he or she
participated in violating the plaintiff's rights, directed
others to violate them, or, as the person in charge, had
knowledge of and acquiesced" in the subordinate's
unconstitutional conduct." A.M. ex rel. J.M.K., 373 F.3d at 586
(citing Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir.
1995)).

Here, Christmann concedes that Link had no personal
involvement in the events at issue. Therefore, her claim turns

on whether Link "established and maintained a policy, practice or custom which directly caused [the] constitutional harm." Barkes, 766 F.3d at 316. She seeks to establish such liability by relying on a failure-to-supervise theory, which is "generally considered a subcategory of policy or practice liability." Id.

The Third Circuit has "developed a four-part test for determining whether an official may be held liable on a claim for a failure to supervise." Id. at 317. The test requires that a plaintiff:

> [I]dentify a supervisory policy or practice that the supervisor failed to employ, and then prove that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory practice or procedure.

Id. (citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989)).

In support of her argument that Link is liable under a failure-to-supervise theory, Christmann points to three policies and procedures: the unwritten policy requiring a 3:2 staff-to-inmate ratio before opening Charles's cell door, the Post Order, and policies governing Extraordinary Occurrence Reports.

As to the unwritten staff-to-inmate ratio policy, Christmann argues that "having a correctional officer wait until

a third officer shows up . . . is evidence of a deficient
policy," particularly given E-Block's large size. See Pl.'s
Resp. Opp'n Def.'s Mot. Partial Summ. J. 12, ECF No. 72.

Next, Christmann points to the Post Order policy, which
governs the provision of medical treatment on an emergency
basis. In relevant part, the policy states:

> In a Medical Emergency the officer should dial
> extension 300 first and notify medical staff of the
> following:
> - Your name and location
> - Nature of the emergency (suspected medical
>   problem)
> - Identity of the person injured.
> - The Control Center should be notified after
>   this. Apply First Aid/C.P.R. until medical
>   assistance arrives.

Id. Ex. 6 at 22. Christmann argues this policy is inadequate
given "the number of cells on E-Block and the number of
inmates," as well as "[t]he distance to be covered by medical
personnel, the number of officers and/or staffing of officers,
and the time it takes to respond to medical emergencies." Pl.'s
Resp. Opp'n Def.'s Mot. Partial Summ. J. 10, ECF No. 72.

Finally, Christmann points to the policy governing staff
reporting of "extraordinary occurrences," defined as "any
occurrence that has a significant impact, or potential for
significant impact, upon the public, staff, inmates, physical
plant, operation of the facility and/or state owned property
under the jurisdiction of the Department, that requires staff

9

action or response, but may not necessitate activation of the facility emergency plan." Id. Ex. 7. The policy requires, inter alia, that all reports of extraordinary occurrences be forwarded to the facility manager. See id. The record includes Extraordinary Occurrence Reports documenting the deaths of sixteen inmates in the three years before Charles's death. See Def.'s Mot. Partial Summ. J. Ex. 1, ECF No. 62-2. Christmann avers that, as superintendent and facility manager, Link "would receive every report on each Extraordinary Occurrence." Id. at 2.

Christmann argues these three policies created an unreasonable risk of a constitutional violation, thereby satisfying the first prong of the four-part test for holding Link liable under a failure-to-supervise theory. See Barkes, 766 F.3d at 316. However, the record evidence to which she points is insufficient to sustain this argument.

As to the 3:2 staff-to-inmate ratio, the only evidence of the policy's alleged unreasonableness to which Christmann points is Charles's death. She does not argue, for example, that the policy deviates from standard practice at similar institutions, or that managers could have effectively protected staff and safeguarded the prison absent this policy.[5] She likewise fails to

---

[5]     One way to show "an unreasonable risk of a constitutional violation" is to rely on expert testimony about best practices in other institutions. Plaintiff produced no expert testimony on this subject.

point to record evidence indicating the medical emergency protocols outlined in the Post Order, which instruct staff to notify medical personnel of the emergency and to apply first aid and CPR, created an unreasonable risk of a constitutional violation.

As to the Extraordinary Occurrence Reports, Christmann concedes that the reports in the record do not reflect that delays in treatment played a substantial factor in the inmates' deaths. See Pl.'s Resp. Opp'n Def.'s Partial Mot. Summ. J. 9, ECF No. 72. While she argues the lack of information in the reports evinces a deficient reporting policy allowing Link to shield herself from liability, see id. at 9-10, her inability to point to record evidence indicating that delays in treatment contributed to any of the deaths documented in the reports is fatal to her argument that the reporting policy created an unreasonable risk of a constitutional violation.

On this record, even construed in the light most favorable to her, Christmann cannot satisfy the first prong of the failure-to-supervise liability analysis. Therefore, Link is entitled to summary judgment on Christmann's § 1983 claim against her.[6]

---

[6]     Link also argues she is entitled to qualified immunity. Because the record cannot support Christmann's § 1983 claim against her, the qualified immunity analysis is inapplicable.

Because Christmann's wrongful death claim against Link is contingent upon the success of her § 1983 claim, Link is also entitled to summary judgment on the wrongful death claim. See Sullivan v. Warminster Twp., 765 F. Supp. 2d 687, 707 (E.D. Pa. 2011) ("[W]rongful death and survival actions are not substantive causes of action; rather, they provide a vehicle through which plaintiffs can recover for unlawful conduct that results in death.").

For the foregoing reasons, the Court will grant Link's motion for partial summary judgment.

### B.   Remaining Defendants' Motion for Summary Judgment

Officer Davison, Lieutenant McClain, Nurse Buzdygon, and Nurse Martin argue they are entitled to summary judgment for the following reasons: (1) the record evidence cannot allow a reasonable jury to find in Christmann's favor on her § 1983 claims; (2) they are entitled to qualified immunity; and (3) the record evidence cannot allow a reasonable jury to find in Christmann's favor on her state law claims.[7] Christmann did not

---

[7]     Count V of Christmann's Second Amended Complaint brings a claim for wrongful death against all defendants. While the defendants' motion for summary judgment explains that they understand the Count to be "asserted against Link because it provides the vehicle for a deceased person's estate to pursue § 1983 claims on harm the deceased suffered and allows eligible survivors to recover damages," see Defs.' Mot. Summ. J. 14 n.6, ECF No. 74, the motion does not address the Count as to Davison, McClain, Martin, and Budzygon. However, defense counsel clarified at oral argument that all defendants move for summary judgment on this Count.
    As set forth below, McClain, Martin, and Budzygon are entitled to summary judgment on Christmann's § 1983 claim. Because Christmann's wrongful death claims against those defendants are contingent upon the success of her

file a response to Buzdygon and Martin's motion, and counsel for
Christmann represented at oral argument that she does not oppose
the motion. <u>See</u> Pl.'s Resp. Defs.' Mot. Summ. J. 2 n.2, ECF No.
80.

The Court will proceed to address the aspects of the
defendants' motion for summary judgment Christmann opposes
(i.e., the claims against Davison and McClain), followed by the
aspects of the motion she does not oppose (i.e., the claims
against Buzdygon and Martin).

    1.   <u>Davison</u>

       a.  <u>§ 1983</u>

First, Davison argues that, on the record before the Court,
Christmann cannot establish that she violated Charles's Eighth
Amendment rights.

"The Eighth Amendment, which applies to the States through
the Due Process Clause of the Fourteenth Amendment, prohibits
the infliction of 'cruel and unusual punishments' on those
convicted of crimes." <u>Wilson v. Seiter</u>, 501 U.S. 294, 296–97
(1991) (citation omitted). "[A] prison official cannot be found
liable under the Eighth Amendment for denying an inmate humane

---

§ 1983 claims, McClain, Martin, and Budzygon are also entitled to summary
judgment on the wrongful death claims. <u>See</u> <u>Sullivan</u>, 765 F. Supp. 2d at 707.

    Because, as set forth below, Christmann's § 1983 claim against Davison
survives summary judgment, her wrongful death claim against Davison also
survives.

conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety . . . ." <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994). For instance, "prison officials violate the Eighth Amendment when they act deliberately indifferent to a prisoner's serious medical needs by 'intentionally denying or delaying access to medical care or interfering with the treatment once prescribed.'" <u>Pearson v. Prison Health Serv.</u>, 850 F.3d 526, 534 (3d Cir. 2017) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 104-05 (1976)).

"In order to sustain this constitutional claim under 42 U.S.C. § 1983, a plaintiff must make (1) a subjective showing that 'the defendants were deliberately indifferent to [his or her] medical needs' and (2) an objective showing that 'those needs were serious.'" <u>Id.</u> (quoting <u>Rouse v. Plantier</u>, 182 F.3d 192, 197 (3d Cir. 1999)).

Here, there is no dispute that Charles's needs were objectively serious. Christmann argues Davison evinced deliberate indifference to those needs by, inter alia, waiting until additional officers arrived before opening the cell door and by allegedly ignoring Shaw's cries for help for approximately thirty minutes.

As to Davison's decision to wait until additional staff arrived to open the cell door, Davison highlights that it is undisputed that she "was told by the Main Control to wait until

additional officers arrived, an order which [she] could not disregard and which made sense to her given the practice and procedures at the institution." Defs.' Mot. Summ. J. 6, ECF No. 74. She highlights footage from the surveillance camera, which shows that she "was at the cell with her key in the door, which she immediately opened when additional staff reached the area— five minutes and forty-six seconds after she first discovered the situation." Id. at 4-5. She also highlights that it is undisputed that she performed CPR until Martin and Buzdygon arrived.

Even construing this evidence in the light most favorable to Christmann, the record cannot support a finding that Davison acted with deliberate indifference by following the unwritten policy requiring her to await the arrival of additional staff before opening Charles's cell door. The order to follow the policy came from Davison's superior, and it was reasonable for her to believe that adhering to the policy helped protect staff and ensure a secure facility.

As to the allegation that Davison ignored Shaw's prolonged cries for help, Christmann points to Shaw's deposition testimony that he and other inmates in his proximity screamed for help for more than thirty minutes and avers that "[d]uring this time, Defendant Davison is seen on the security footage ignoring [Shaw's] cries for help as she moves boxes and chairs from the

15

bridge into cells that were adjacent" to Charles's. Pl.'s Resp. Opp'n Defs.' Mot. Summ. J. 2, ECF No. 80.

For her part, Davison points to her deposition testimony that she did not hear anyone yelling for help, and she argues that much of Shaw's testimony about her actions "is plainly discredited by the video" and therefore "should be disregarded and cannot be used to create a factual dispute." Defs.' Mot. Summ. J. 5, ECF No. 74. However, because the security footage of the events at issue does not have sound, see id. Ex. 9, the Court cannot say that Shaw's account is "blatantly contradicted by the record, so that no reasonable jury could believe it." See Scott v. Harris, 550 U.S. 372, 380 (2007).

As this dispute reflects, the parties have pointed to conflicting record evidence as to whether Davison "deliberate[ly] disregard[ed]" Shaw's "prolonged cries for help" for more than thirty minutes. See Pl.'s Resp. Opp'n Defs.' Mot. Summ. J. 5, ECF No. 80. Accordingly, the factfinder must determine whether Davison heard and disregarded Shaw's cries.

Because Christmann has pointed to a genuine issue of material fact as to whether Davison acted with deliberate indifference to Charles's serious medical needs, Davison is not

entitled to summary judgment on Christmann's § 1983 claim

against her.[8]

### b. Qualified Immunity

Next, Davison argues qualified immunity bars the § 1983

claim against her.

"When properly applied, [qualified immunity] protects 'all

but the plainly incompetent or those who knowingly violate the

law.'" Spady v. Bethlehem Area Sch. Dist., 800 F.3d 633, 637 (3d

Cir. 2015) (alteration in original) (quoting Ashcroft v. al-

Kidd, 563 U.S. 731, 743 (2011)). "In considering the

applicability of qualified immunity, courts engage in a two-

pronged examination. First, a court must decide 'whether the

facts that a plaintiff has . . . shown make out a violation of a

constitutional right.'" Id. (quoting Pearson v. Callahan, 555

U.S 223, 232 (2009)).

Second, "the court must determine 'whether the right at

issue was 'clearly established' at the time of defendant's

alleged misconduct.'" Id. (quoting Pearson, 555 U.S. at 232).

"'[C]learly established' for purposes of qualified immunity

means that '[t]he contours of the right must be sufficiently

---

[8]       Christmann also argues that Davison evinced deliberate indifference by
"fail[ing] to follow Graterford's own policies and procedures concerning
inmate medical emergencies." See Pl.'s Resp. Opp'n Defs.' Mot. Summ. J. 12,
ECF No. 80. Because Christmann has already pointed to a genuine issue of
material fact with respect to Davison's alleged deliberate indifference, the
Court need not reach this argument.

clear that a reasonable official would understand that what he is doing violates that right.'" Wilson v. Layne, 526 U.S. 603, 614–15 (1999) (alterations in original) (quoting Anderson v. Creighton, 483 U.S. 635, 639 (1987)). The Supreme Court has repeatedly instructed lower courts "not to define clearly established law at a high level of generality." Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018) (quoting City & Cty. of San Francisco v. Sheehan, 575 U.S. 600 (2015)). While Supreme Court caselaw "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." Id. (quoting White v. Pauly, 137 S. Ct. 548, 551 (2017)).[9]

"Although qualified immunity is a question of law determined by the Court, when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury." Monteiro v. City of Elizabeth, 436 F.3d 397, 405 (3d Cir. 2006).

Here, Davison's entitlement to qualified immunity turns on disputed issues of fact, i.e., whether Davison heard and ignored

---

[9]    The Supreme Court has also recognized that "general statements of the law are not inherently incapable of giving fair and clear warning, and . . . a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." Hope v. Pelzer, 536 U.S. 730, 741 (2002) (quoting United States v. Lanier, 520 U.S. 259, 271 (1997)); see also Taylor v. Riojas, 141 S. Ct. 52, 54 (2020) (per curiam) ("Confronted with the particularly egregious facts of this case, any reasonable officer should have realized that Taylor's conditions of confinement offended the Constitution.").

the cries for help in a life-threatening emergency for more than thirty minutes. If she did so, under existing precedent, no reasonable corrections officer could have thought it constitutionally permissible, particularly absent evidence that the failure to respond was compelled by necessity. See supra n.9.

Because there is sufficient record evidence to support a set of facts under which Davison would not be entitled to qualified immunity, the Court will deny Davison's motion for summary judgment.[10]

       2.  McClain

Next, Lieutenant McClain, Davison's supervisor, argues the record cannot support Christmann's claim that he acted with deliberate indifference, as needed to establish an Eighth Amendment violation.

In response, Christmann argues McClain evinced deliberate indifference to Charles's serious medical needs by instructing Davison "to violate her Post Orders, a written policy, based on an unwritten policy that required a 3:2 officer to inmate ratio"[11] and by "wait[ing] over twenty-one (21) minutes after

---

[10]    If the jury were to find as a factual matter that Davison did not hear and ignore the cries for help as alleged, she would be in a position to reassert her claim for qualified immunity, which the Court would then decide as a matter of law.

[11]    McClain disputes that he ordered Davison to wait for backup before opening the cell door and avers that "discovery revealed that this order came

Defendant Davison informed him of Mr. Christmann's emergency medical condition before he called 911." Pl.'s Resp. Opp'n Defs.' Mot. Summ. J. 15, ECF No. 80. Christmann avers that as the day captain on the shift, McClain was the only one authorized to call 911.

This record cannot support a finding that McClain acted with deliberate indifference. Instructing a subordinate to await the arrival of additional staff to ensure a 3:2 officer to inmate ratio is reasonably calculated to protect staff and maintain a secure facility, even during a medical emergency. See Bell v. Wolfish, 441 U.S. 520, 547 (1979) (explaining that, because "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions," prison administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.").

Further, Christmann does not dispute that staff nurses equipped with a defibrillator proceeded to Charles's cell

---

from Captain Reeder, the shift commander that evening." Defs.' Mot. Summ. J. 9, ECF No. 74.

In response, Christmann argues the record is unclear on this point, and she points to Davison's deposition testimony indicating McClain gave the order. See Davison Dep. 46:7-47:17, ECF No. 80-1; Pl.'s Resp. Defs.' Mot. Summ. J. 7, ECF No. 80.

For purposes of the instant motion, the Court must construe this dispute in favor of Christmann as the non-movant and presume that McClain made the call.

immediately after learning of the emergency. See infra Section III.B.3.a. Even construed in the light most favorable to Christmann, this record cannot support a finding that McClain knew of and disregarded an excessive risk to Charles's health and safety.

Therefore, McClain is entitled to summary judgment.[12]

### 3.   Buzdygon and Martin

Finally, nurses Buzdygon and Martin move unopposed for summary judgment on Christmann's § 1983 claim, as well as on the state law claims against them.

The Court cannot grant a motion for summary judgment merely because it is unopposed. See E.D. Pa. R. Civ. P. 7.1(c). Instead, it must conduct its own analysis of whether granting the motion is appropriate. See Fed. R. Civ. P. 56(e).

### a.   § 1983

First, Buzdygon and Martin argue they are entitled to summary judgment on the § 1983 claim because the record establishes that "they responded to the scene as quickly as possible" and "[t]here is no evidence of them providing anything but appropriate care." Defs.' Mot. Summ. J. 7, ECF No. 74.

Buzdygon and Martin's motion and supporting materials show that they are entitled to summary judgment on this claim. See

---

[12]   McClain also argues he is entitled to qualified immunity. Because the record cannot support Christmann's § 1983 claim against him, the qualified immunity analysis is inapplicable.

Fed. R. Civ. P. 56(e). The facts of record indicate that they proceeded to E-block immediately after learning of the medical emergency and that they took medical equipment, including an automated external defibrillator, with them. Upon reaching Charles's cell, they provided CPR and applied the defibrillator, which administered a shock. Martin told the officers in her presence to call 911. She and Buzdygon continued to provide care to Charles during his transport to the dispensary. See Defs.' Statement of Undisputed Material Facts ¶¶ 34-46, ECF No. 74-2. These record facts could not support a finding that Buzdygon and Martin acted with deliberate indifference in the face of Charles's serious medical needs.

Accordingly, Buzdygon and Martin are entitled to summary judgment on the § 1983 claim.[13]

b.   State Law Claims

Finally, Buzdygon and Martin argue they are entitled to summary judgment on Christmann's state law claims for negligence and medical malpractice "because there has been no certificate of merit filed in this matter" and because there is no record evidence "suggesting that the medical care they provided here in any way deviated from the professional standards of care." Defs.' Mot. Summ. J. 11, ECF No. 74.

---

[13]   Buzdygon and Martin also argue they are entitled to qualified immunity. Because the Court will grant their motion for summary judgment on the § 1983 claim, it need not reach this issue.

Again, Buzdygon and Martin's motion and supporting materials indicate they provided appropriate medical treatment, and Christmann has pointed to no record evidence to the contrary. See supra Section IV.B.2.a. Accordingly, Buzdygon and Martin are entitled to summary judgment on Link's claims for negligence and medical malpractice. See Fed. R. Civ. P. 56(e).

## IV.   CONCLUSION

For the foregoing reasons, the Court will grant the motions for summary judgment as to defendants Link, McClain, Buzdygon, and Martin and will deny the motion for summary judgment as to defendant Davison.